UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Docket No.: 24-112 (KMM/DTS)

| | |
|---|---|
| United States of America, | |
| Plaintiff, | |
| v. | **DEFENDANT'S POSITION REGARDING SENTENCING** |
| Tezzaree El-Amin Champion, | |
| Defendant. | |

## INTRODUCTION

Mr. Champion is a dreamer. Since childhood, he has aspired to build a better life for himself, his family, and his community. Doc. 103. Unlike many defendants who come before the Court on fraud charges, he is not the typical white-collar offender. His life has been shaped by hardship, growing up in a disadvantaged neighborhood and unstable homes.

His advisory Guideline range is significantly higher than the sentences typically imposed in comparable fraud cases. This is driven in large part by the mechanical operation of the Guidelines, particularly his criminal history score and his inability to qualify for the "zero-point offender" reduction. These factors, while relevant, do not capture the broader context of Mr. Champion's life.

Despite his offense, Mr. Champion has consistently shown himself to be someone who helps others whether its desire to inspire his peers by writing a book when he was 13, to starting a non-profit to help his community. The letters of support submitted on his

1

behalf describe a man who is generous, inspired, and deeply connected to his community. Doc. 104. Even the victim of his prior assault, a rare and powerful voice, has written in support of him, attesting to his integrity and character beyond the conduct at issue in this case. *Id.* at 1–2.

## REQUESTED SENTENCE

Mr. Champion respectfully requests that the Court impose a sentence substantially below the advisory Guideline range that the Court ultimately determines. Mr. Champion acknowledges that this request is well below the advisory range calculated under either the plea agreement or the Court's calculation. However, such a sentence is *sufficient but not greater than necessary* to meet the purposes of sentencing under 18 U.S.C. § 3553(a).

This requested sentence appropriately reflects the mitigating factors present in this case, including Mr. Champion's challenging upbringing, his demonstrated resilience and self-initiated rehabilitation, and the strong support he has from his community. It also accounts for the significant disparity between his advisory range and the typical sentences imposed in comparable fraud cases within this District and across the country. Finally, a shorter prison term will better serve the statutory goal of restitution, allowing Mr. Champion to reenter the workforce and begin making meaningful payments toward the more than $3 million he owes to the public.

## LEGAL STANDARD

The Sentencing Guidelines should be the starting point for the court when sentencing a person convicted of a federal crime. *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007). Although the first step should be

calculating the applicable sentencing range under the Sentencing Guidelines, the sentencing judge should not presume the sentencing range to be reasonable. *Gall*, 552 U.S. at 50. The Sentencing Guidelines are *advisory*, not mandatory. *United States v. Booker*, 543 U.S. 220, 245 (2005). The sentencing judge must make an individualized assessment based on the facts of each case. *Gall*, 552 U.S. at 50. Thus, the Sentencing Guidelines are but one factor the court should consider when determining whether a sentence achieves the purposes set forth in 18 U.S.C. § 355(a).

The Supreme Court has reiterated this point, noting that '[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," and that "[t]he Guidelines are not only mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009).

In light of its "discrete institutional strength, a district court's decision to vary from the advisory guidelines may attract greatest respect when the sentencing judge 'finds a particular case outside the "heartland" to which the Commission intends individual Guidelines to apply.'" *Id.* (quoting *Rita v. United States*, 551 U.S. 338, 344 (2007)). A sentencing judge has greater familiarity with an individual case and an individual defendant than the Commission or the appeals court and is "therefore 'in a superior position to find facts and judge their import under § 3553(a)' in each particular case." *Kimbrough*, 552 U.S. at 574 (quoting *Gall*, 552 U.S. at 597). In considering the § 3553(a) factors, "[a] district court is not required to recite each of the sentencing factors under 18 U.S.C. § 3553(a), as long as the record makes clear that they were considered." *United States v. Powills*, 537 F.3d 947, 950 (8th Cir. 2008) (citing *United States v. Hernandez*, 518 F.3d

3

613, 616 (8th Cir. 2008)).

**ARGUMENT IN SUPPORT OF REQUEST**

I.     **§3553(a) Factors supporting a downward variance.**

Under 18 U.S.C. 537 F.3d 947 3553(a), the Court shall impose a sentence "sufficient, but not greater than necessary" and shall consider:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed –

   a. To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   b. To afford adequate deterrence to criminal conduct;

   c. To protect the public from further crimes of the defendant; and

   d. To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) The kinds of sentences available;

(4) The kinds of sentence and the sentencing range established [by the Sentencing Commission in the Guidelines]…

(5) Any pertinent policy statement [issued by the Sentencing Commission]…

(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) The need to provide restitution for any victims of the offense.

   a. **History and Characteristics of Defendant**

Mr. Champion's life has been defined as much by adversity as by his determination to rise above it. He grew up in North Minneapolis, one of the city's most disadvantaged neighborhoods, where exposure to drugs, street violence, and poverty was constant. Doc. 93 at 21–22. From an early age, he saw family, friends, and neighbors drawn into cycles of substance use and street life. *Id.* at 22. Even as a boy, however, he recognized that he wanted something different for himself. As soon as he was old enough to speak, he scolded the adults in his house against drug and alcohol use, in an attempt to make them stop. He was 7 when he announced to the adults in his life that he was saving every penny so that, "when I am big, I can buy a house with no cigarettes and no drugs and no alcohol".

While Mr. Champion's childhood shared much in common with those of other children in his community, his response set him apart. He was raised by his mom, grandma and great-grandma, in one household. All three of them struggled with alcohol and drug addiction and at times engaged in verbal abuse. *Id.* The home environment was unpredictable, marked by love and effort, but also by instability and emotional strain. His parents separated the year he was born, and his father's absence left a lasting vo*Id. Id.* A professional basketball player, his father spent most of Mr. Champion's youth overseas in Turkey, returning home only briefly each year. *Id.* at 21. Their contact was steady but distant, never forming the consistent emotional bond a child needs because he had several other children with his then wife. *Id.*

Financially, life was difficult. His mother's income was limited, and at times she relied on his father for help with bills or groceries. Mr. Champion recalls that although money was scarce, his mother made sure he did well in school, earning straight A's

5

throughout all of his schooling. Those experiences instilled in him both gratitude and a deep sense of responsibility toward his family. Despite the hardship, his mother remained steadfast in prioritizing his education and allowing him to choose a better path for himself.

At just twelve years old, Mr. Champion made an extraordinarily mature decision for a child, he left his mother's home and went to live with his paternal grandmother to escape the chaos and verbal abuse he was experiencing. This was not a decision motivated by rebellion or delinquency, but by insight and self-preservation. His move to his grandmother's home represented the first of several pivotal choices he would make in his life to seek safety, stability, and growth. That decision alone reflects a degree of maturity and self-awareness far beyond his years.

Life with his grandmother provided the stability he had long needed. His grandmother was a nurturing presence who valued discipline, education, and faith. She also served as a bridge between the competing cultural and religious influences in his life. Mr. Champion's mother was Christian, while his father and paternal family were Muslim. This dynamic often created tension within the family, even about simple matters such as what foods were appropriate to eat or how holidays should be observed. His grandmother would often step in, preparing healthy meals and helping him understand both sides of his heritage. The exposure to two faith traditions helped Mr. Champion develop empathy, tolerance, and a sense of identity rooted in understanding rather than division.

Although his childhood was marked by instability and hardship, it was also characterized by moments of remarkable resilience and growth. Mr. Champion found constructive ways to stand out even when his circumstances would have led most young

6

people down a different path. He stayed out of legal trouble as a juvenile, avoided the pull of the street culture around him, and focused on self-improvement. His commitment to education and creative expression culminated in the publication of his own book, *It's Not About Your Looks. It's Mostly About Your Books*. Doc. 103.

The Pre-Sentence Investigation Report notes that Mr. Champion's Adverse Childhood Experiences (ACE) score is 5, a level strongly correlated with long-term trauma, emotional dysregulation, and increased vulnerability to substance use and criminal behavior. Doc. 93 at 23. Yet, rather than allowing that early adversity to define him, Mr. Champion has spent most of his adult life striving to rise above it.

Mr. Champion has described his journey candidly: he sees his life not as one of natural resilience but of constant effort and hunger for self-improvement. He acknowledges that he has stumbled twice and recognizes that much of that stems from growing up without role models. When he was sentenced to prison for the first time, his mother's reaction, expressing pride that her son was "not soft" because he had gone to prison, was a painful revelation. It startled him into realizing that if he did not separate himself from his family's destructive patterns, he would spend the rest of his life behind bars. That insight marked the beginning of meaningful change.

Mr. Champion describes the sadness he carries from lacking family members on his mother's side whom he can trust, a feeling he likens to a weight on his shoulders. Yet, what keeps him moving forward is his determination to become a better man. As he put it, "the very best part of me is that I will never stop trying with all my strength to be a better person."

That hunger for growth is what drove him as a child to cling to his grandmother for stability and what led him, as an adult, to his godmother, whom he met four years ago and now considers family. She comes from a world where morals and ethics are a way of life, and she expects him to live by the same standards: respect for others, no drugs, no alcohol, and honesty in his conduct. She loves him like a son but maintains clear boundaries, and Mr. Champion values those rules because he knows they represent what he has always hungered for. Life with his godmother has already taught him invaluable lessons, simple but transformative things, like admitting when he is wrong and taking accountability for his actions.

Mr. Champion has reinforced this personal growth through formal efforts as well. In 2024, he participated in twenty-two therapy sessions, and in early 2025, he voluntarily entered substance-abuse treatment to address Percocet misuse. Doc. 93 at 23. These were not court-ordered interventions or efforts to gain a litigation advantage, they were self-initiated acts of accountability and reflection.

Taken together, Mr. Champion's history reflects both the difficulty of his beginnings and the strength of his response to them. He is a man who grew up in the shadow of systemic disadvantage yet continually sought to rise above it. First as a child seeking safety, later as a young adult pursuing education and creativity, and now as a grown man striving for stability, accountability, and redemption. His background does not excuse his conduct, but it explains it.

### i. Support From His Community

The letters of support submitted on Mr. Champion's behalf reflect a consistent and

8

compelling theme: he is a person defined not by his mistakes, but by his compassion, accountability, and dedication to helping others. Friends, family members, and community members describe him as a mentor, advocate, and stabilizing presence whose absence would be deeply felt.

B.K., a young man who was homeless when he met Mr. Champion, credits him with providing housing, food, and mentorship that ultimately helped him achieve stability and pursue a career in law enforcement. Doc. 104 at 3–4. A.M., the mother of a woman struggling with addiction, recounts how Mr. Champion organized interventions, ensured her daughter's access to treatment, and personally assisted her through relapses and probation. *Id.* at 5–6. Despite his own challenges, Mr. Champion remained a source of unwavering support for those around him.

Equally significant, the Court has received a letter from L.R., the named victim in Mr. Champion's 2017 assault case, who confirms that he and T.C. have reconciled and rebuilt their friendship. *Id.* at 1–2. L.R. describes Mr. Champion's acceptance of responsibility, his efforts toward personal growth, and his ongoing commitment to educating others about accountability and respect. *Id.* at 1. Specifically, L.R. wrote, "He's [Tezzare's] learned some hard lessons, but I truly believe he has the ability to use those lessons to guide and uplift others." *Id.* at 2. L.R.'s willingness to speak on Mr. Champion's behalf underscores genuine rehabilitation and restorative progress that cannot be replicated through incarceration.

Additional letters from family members and peers further attest to Mr. Champion's integrity and love for others. Mr. Champion's grandmother wrote about his generosity at a

young age when he would tutor children 3–4 times a week. *Id.* at 8. Mr. Champion's aunt also speaks about his generous spirit. *Id.* at 10–12. She wrote about how she would give Mr. Champion money as a kid to buy snacks when he would play with the neighborhood kids. *Id.* at 11. Instead of just taking the money, however, Mr. Champion would ask for a little extra, or would work more chores to earn it, so that the other kids would also have money to buy snacks. *Id.* at 11. From a young age, Mr. Champion was thinking about others.

Collectively, these letters demonstrate that Mr. Champion has become a positive influence within his community and that those closest to him view this case as an aberration in an otherwise productive and generous life.

Taken together, the support and reconciliation evidenced in these letters provide strong mitigation under §3553(a)(1). They show that Mr. Champion has internalized the lessons from this case, rebuilt trust with those he once harmed, and is uniquely positioned to continue contributing to his family and community in meaningful, restorative ways.

### b. Nature and Circumstances of the Offense and Mr. Champion's Reflection

The most difficult part of this case for Mr. Champion is that the very dream that once gave him purpose, his desire to build and lead a nonprofit organization lies at the center of this prosecution. His nonprofit, Encouraging Leaders, was a source of immense pride and represented his commitment to giving back to his community. He created opportunities for others, particularly young people who faced the same obstacles he once did, and the letters presented to the Court represent a tiny fraction of the hundreds of people

he helped. It is devastating to him that an organization he built to help others is now tarnished by his own poor decisions.

Mr. Champion was not chasing status or wealth in this scheme. There were no luxury cars, no extravagant spending, no indulgent lifestyle. Instead, he directed what he gained toward supporting his family and others in similar hardships. The same instinct that once drove him, as a boy, to seek stability and care for those around him, later led him to take misguided actions in an effort to help. He recognizes now that his choices were unlawful and wrong, but they were never rooted in malice or greed.

There are many explanations for how Mr. Champion became involved in this offense. Mr. Champions offers them not as excuses, but as context. During the height of the COVID-19 pandemic, he was trying to stabilize his life after leaving prison and bring to his community engagement and entrepreneurship. He launched several ventures, including a non-profit to help at-risk youth, a marketing business and a property maintenance company. Through his connections to other nonprofit leaders, he was introduced to aspects of nonprofit grant funding by a more experienced mentor, someone he believed could help him navigate the complex administrative requirements of running a charitable organization. Instead, that guidance led him down a path that blurred legitimate opportunity with misconduct.

He crossed paths with someone he trusted that he should not have. Mr. Champion met an individual who presented the scheme as harmless, even helpful. This gave misguided reassurance that his actions weren't *totally* wrong. Coming from a background where opportunity was scarce and survival often required improvisation, Mr. Champion

11

allowed himself to believe that justification. Now, he knows that he should have trusted his own instincts and judgment, and he is remorseful for allowing another's influence to cloud his moral compass.

Mr. Champion accepts full responsibility for the decisions he made. He understands that good intentions cannot erase the harm caused and that his actions undermined public trust in programs meant to assist BIPOC who own small businesses. Yet, the origins of this case, his ambition to serve his community, underscore that this offense was not born of greed. That distinction does not excuse his conduct, but it helps explain how a young man, driven by the desire to do good, lost his way amid confusion, pressure, and poor advice during an extraordinary period of national crisis.

### c. Unwarranted Sentencing Disparities and the Broader Context of Criminal History

In assessing the need to avoid unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6), the Court must consider not only the outcomes comparable fraud cases but also the social and structural context in which defendants' criminal histories develop. While criminal history is a relevant factor in evaluating relative culpability and risk, it is not a neutral measure. Criminal records are often shaped by systemic disparities in policing, prosecution, and access to opportunity. For many young Black men who grow up in disadvantaged neighborhoods and unstable homes, early contact with the criminal justice system is more a product of circumstance as of choice.

Here, Mr. Champion's felony assault and DWI occurred against a backdrop of instability, economic hardship, and lack of support. These experiences do not diminish

accountability, but they do help explain how a young man's trajectory can be influenced by forces beyond his control. Treating these prior offenses as precise indicators warranting increased punishment or future danger would risk reinforcing, rather than correcting, the very inequities the Court is bound to avo*Id*. Many similarly charged defendants with resources, stability, or access to diversionary programs would not carry equivalent criminal history points. The resulting differential is itself an unwarranted disparity within the meaning of § 3553(a)(6).

Moreover, the Court may consider that the Sentencing Guidelines can at times overstate the punishment necessary in fraud cases involving government funds. The Guidelines' use of enhancements for loss amounts, number of victims, and use of sophisticated means can stack rapidly and disproportionately particularly in cases arising from an unprecedented national crisis. These enhancements risk converting every fraud case into a de facto maximum sentence.

When evaluating proportionality and fairness, it is therefore appropriate to consider sentences imposed in comparable fraud cases involving similar loss amounts and restitution obligations. Although no two cases are identical, reviewing ouMr. Championomes in other federal fraud prosecutions provides a meaningful benchmark. The following chart summarizes a range of recent cases within this District involving defendants convicted of fraud offenses:

| COURT FILE NO. | LENGTH OF SENTENCE | RESTITUTION AMOUNT | U.S.S.G. §2B1.1(B)(1) SPECIFIC OFFENSE CHARACTERISTIC (LOSS AMOUNT) |
|---|---|---|---|
|  |  |  |  |

| | | | |
|---|---|---|---|
| 22-CR-224(2) | 51 months | $5,000,240 | $9.5 – $25 million |
| 23-CR-882 | 43 months | $2,434,360 | $1.5 – $3.5 million |
| 22-CR-124 | 210 months | $47,920,514 | — |
| 24-CR-52 | 30 months | $2,104,395 | $1.5 – $3.5 million |
| 20-CR-232(21) | 60 months | $19,051,667 | $9.5 – $25 million |
| 23-CR-27 | 63 months | $2,144,291.86 | $1.5 – $3.5 million |
| 20-CR-232(19) | 96 months | $2,722,431.11 | — |
| 21-CR-169 | 63 months | $658,490.00 | $1.5 – $3.5 million |
| 22-CR-308(1) | 27 months | $3,957,364.62 | $1.5 – $3.5 million |
| 22-CR-308(2) | 21 months | $3,265,363.14 | $1.5 – $3.5 million |
| 23-CR-117 | 51 months | $3,100,000 | $1.5 – $3.5 million |
| 22-CR-173 | 36 months | $19,673,794 | $9.5 – $25 million |
| 24-CR-139 | 51 months | $2,700,000 | $1.5 – $3.5 million |

National data further supports this proportionality analysis. On March 23, 2023, the IRS Criminal Investigation Division released national statistics on COVID-relief fraud.[1] Over the three-year period reviewed, 458 individuals were indicted, and 236 individuals had been sentenced, receiving average prison terms of approximately 37 months in prison. *Id.* The report highlights, for example, a California man who fraudulently obtained $5 million in Paycheck Protection Program funds and was sentenced to 54 months in prison, and a New York woman who obtained $9.2 million in PPP funds and was sentenced to 45

---

[1] https://www.irs.gov/compliance/criminal-investigation/irs-ci-releases-covid-fraud-statistics-ahead-of-the-3rd-anniversary-of-the-cares-act.

14

months. *Id.* These examples reflect that even in cases involving multimillion-dollar frauds, sentences have generally clustered around three to four years of imprisonment.

On March 26, 2025, the IRS Criminal Investigation Division updated the statistics.[2] Over the five-year period reviewed, 1,028 individuals were indicted, and 569 individuals had been sentenced, receiving average prison terms of approximately 31 months in prison. *Id.* The report highlights a person who was ordered to pay 15.9 million in restitution and was sentenced to 52 months in prison.

Taken together, these data points and contextual considerations show that a Guideline-level sentence would create an *unwarranted disparity* when measured against comparable defendants and when viewed through the lens of equity. The Court should recognize that while Mr. Champion's criminal history contributes to the advisory range, it also reflects the disproportionate burdens placed on individuals from disadvantaged backgrounds. A downward variance would better achieve the statutory command that the sentence be "sufficient, but not greater than necessary" to promote justice, rehabilitation, and fairness.

### d. Restitution and the Benefits of a Sentence Below the Guideline Range

A shorter term of imprisonment meaningfully serves the statutory goal of restitution. Mr. Champion owes more than $3 million in restitution to the government, a substantial obligation that cannot realistically be satisfied through forfeiture or asset liquidation. Unlike many white-collar defendants, Mr. Champion does not possess real property,

---

[2] https://www.irs.gov/compliance/criminal-investigation/five-years-post-cares-act-irs-ci-has-launched-2039-covid-fraud-investigations-totaling-10b-in-attempted-fraud.

15

investment accounts, or other financial assets that can be seized or sold to offset restitution. His limited economic means stand in stark contrast to defendants who enter sentencing with significant wealth, business holdings, or hidden proceeds from their offenses. For Mr. Champion, restitution will depend entirely on his ability to rebuild his life, secure employment, and make consistent payments over time.

Lengthy incarceration will only delay that process and diminish his ability to contribute meaningfully toward repayment. The reality is that restitution in high-loss fraud cases can only be achieved through long-term reintegration and sustainable earning potential, not extended imprisonment. A shorter custodial term, followed by supervised release focused on employment, financial transparency, and accountability, will maximize his capacity to repay the debt owed to the public. In this respect, a variance below the advisory range advances not only fairness and proportionality, but also the practical and moral imperative of restitution.

## OBJECTIONS TO PSR

### I. Objection to §2B1.1(b)(16)(B) Firearm Enhancement

Mr. Champion objects to the two-level enhancement recommended under U.S.S.G. §2B1.1(b)(16)(B). Doc. 93 at 15 (¶ 75). The PSR asserts that this enhancement applies based on information outlined in Indictment. *Id.* at 12 (¶¶ 59-61); A.1. However, this conduct was not admitted by the defendant at the plea hearing nor otherwise established by a preponderance of the evidence. The government has not indicated that it intends to present any evidence to prove these disputed facts, and the plea agreement does not contemplate application of this enhancement.

16

Under well-established Eighth Circuit precedent, the government bears the burden of proving the factual basis for any sentencing enhancement by a preponderance of the evidence. *United States v. Cochrane*, 608 F.3d 382, 383 (8th Cir. 2010). When a defendant disputes material facts in the Presentence Report, "the sentencing court must either refuse to take those facts into account or hold an evidentiary hearing." *Id.* (quoting *United States v. Morehead*, 375 F.3d 677, 679 (8th Cir. 2004)). If the government fails to meet its burden, the enhancement cannot be applied. *See, e.g., United States v. Poor Bear*, 359 F.3d 1038, 1041–42 (8th Cir. 2004).

Because Mr. Champion did not admit to the conduct underlying the enhancement in the plea agreement, and the government has agreed not to seek to prove those facts at sentencing, there is no factual basis on which the Court can properly apply §2B1.1(b)(16)(B).

## II. Objection to §3B1.1 Four-Point Leadership Enhancement

Mr. Champion objects to PSR recommending of a four-level enhancement under U.S.S.G. §3B1.1(a). Doc. 93 at 15–16 (¶¶ 78 and 82). The parties expressly agreed in the plea agreement that a two-level enhancement under §3B1.1(c) applies, and Mr. Champion entered his plea on that basis. The government has not alleged, and the defendant did not admit, facts establishing that he exercised the type or degree of control over others necessary to warrant the greater four-level enhancement.

Under §3B1.1(a), a four-level enhancement applies only if the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The Guidelines make clear that the determination of a defendant's

17

role in the offense is to be based on all the relevant conduct and factors such as the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. §3B1.1, comment (n.4).

The record here does not establish that the defendant organized or led others. There is no evidence that he recruited participants, directed their actions, made key strategic decisions, or claimed a greater share of the proceeds. At most, the evidence shows that he participated alongside others in a jointly undertaken activity, consistent with the two-level enhancement for a managerial or supervisory role under §3B1.1(c).

Because the defendant did not admit to facts supporting a leadership role, and the government is bound by the terms of the plea agreement, it would be improper to increase the enhancement beyond the parties' stipulated two levels. The Court should sustain this objection and apply only the two-level enhancement under §3B1.1(c), consistent with the plea agreement.

### III.   Objection to Four-Level Enhancement Under §2K2.1(b)(6)(B)

The defense objects to PSR's recommendation of a four-level enhancement under U.S.S.G. §2K2.1(b)(6)(B)[3] for possession of a firearm "in connection with another felony offense." Doc. 93 at 16 (¶ 82). The enhancement was not admitted at the plea hearing, and

---

[3] U.S.S.G. §2K2.1(b)(7)(B) under the 2025 Guidelines.

18

the government has confirmed it does not intend to prove the factual basis necessary to support its application.

Under §2K2.1(b)(6)(B), the government bears the burden to establish, by a preponderance of the evidence, that the firearm "facilitated, or had the potential of facilitating, another felony offense." The mere presence of a firearm at the time of a search, without a demonstrated nexus between the firearm and the other alleged felony, is insufficient. *See United States v. Walker*, 900 F.3d 995 (8th Cir. 2018) (holding that the enhancement requires evidence showing the firearm had some purpose or effect with respect to the other offense, and its presence was not coincidental).

Here, the firearm was discovered when law enforcement executed a search warrant related to a fraud investigation. The plea agreement did not include any admission connecting the firearm to the charged fraud scheme, and the government has indicated it will not seek to establish such a connection at sentencing. Because the factual predicate for §2K2.1(b)(6)(B) is neither admitted nor supported by evidence, the Court should therefore sustain this objection and decline to apply the four-level enhancement.

## CONCLUSION

For all the reasons outlined above, Mr. Champion respectfully requests that the Court grant a substantial downward variance and impose a sentence is sufficient, but not greater than necessary, to serve the purposes of sentencing under 18 U.S.C. § 3553(a) and reflects a just, individualized assessment of the offense before the Court.

Dated: <u>November 9, 2025.</u>                    Respectfully submitted,

*s/ Jill A. Brisbois*
Jill A. Brisbois
Attorney ID No. 0345477
150 South Fifth Street, Suite 1850
Minneapolis, MN 55402
T: (651) 209.7797
E: Jill@thejabfirm.com

*Attorney for Mr. El-Amin Champion*

20